Good morning, your honors. Josh Lee for the appellant Brian Tone. In this case, Mr. Tony presents two claims for a new trial. The first, that the trial judge erroneously told the death penalty if Mr. Tony was convicted, is relatively straightforward. So unless the court tells me otherwise, I'll start with the second issue. Well, I would just ask the question, what could the court have done? I mean, it's rather a difficult situation. It wasn't anything that the court brought on on its own behalf. You had a juror just flat out ask it during voir dire, right? It's the same thing that the judge would do in any other case, which is the judge tells the juror, punishment isn't your concern. Don't worry about punishment. That's my job. And then we can all think about what will happen in the jury room. But yeah, OK. Well, so they'll continue to grind on it and talk about it and speculate about it. So it's better just to lay it to rest, isn't it? So you could have made the same argument in Shannon, where that's the Supreme Court case where the defendant said, well, the jury is not going to know what's going to happen to the defendant if he's found not guilty by reason of insanity. They're going to worry about that. They're going to speculate about that. And the Supreme Court said, no, it is a categorical rule. You tell the jury not to consider punishment. And we assume that they follow their instructions. Wasn't death penalty one level above that? And a juror that is worried about it, you want to flush him out when you initially I'm sorry, say one more time. I say wouldn't this is one level above that, the death penalty. And a lot of jurors will not even be willing to sit. And if a juror asks you if is the death penalty an issue here and you want to have your array what's properly informed, say no, this is not a death penalty case. Now go on with your voir dire. No. And for two reasons. But why? Where is the prejudice? The prejudice is that it invites the jury to consider punishment and therefore introduces confusion into the proceedings and also tempts the jury to go ahead. How can it how can it encourage them to look at the punishment if you said this is not a punishment that you should be concerned about? Because the jury is in the jury room deliberating for two days in this case. What do we think the likelihood that when they're in a log jam, somebody says, well, it's not like that the death penalty. I mean, it's almost certain that that happened. And that's the prejudice. Okay. Is it an absolute rule as you've described it? It's an absolute rule with one exception. You can just never, ever, ever, ever tell the jury anything about a sentence. It's exactly right with one exception that's plainly not applicable. And the exception is if one of the parties injects punishment into the case by giving the jury false information about what the punishment is. Once punishment has already been injected into the case, the judge can correct a misimpression that the jury's been given. But otherwise, yes, the jury is always instructed not to consider penalty and never given information about the punishment. So this court has said that several times. And the most on point case, I think, is this court's decision in Greer, where the court said, if you give the jury information about punishment that, like in this case, tends to favor the prosecution, you tempt the jury to convict on weaker evidence. In Greer, would you concede, Mr. Lee, that there Judge McKay was talking about an ex parte conversation between a marshal and a juror? I mean, that's, and I realize that you may make an argument, as you did in your reply brief, that the situation is even compounded when a district judge pronounces it. But ex parte conversations between a marshal and a juror would strike anybody as completely improper. Except that the court rested on the proposition that you don't provide the jury punishment information. And again, it's even worse if it comes from the judge. Because a jury might discount it, like what does a marshal know about sentencing? But the judge is saying, if you convict, I'm not going to impose the death penalty. It's the functional equivalent of saying that she would exercise leniency. And you can never do that. Here's the other aspect of prejudice. And that is that the jury may have believed that a first degree murder conviction wouldn't necessarily carry a life without parole sentence, could carry a term of year sentence. It's the rare case when a judge has no sentencing discretion whatsoever, and ordinary people understand that. So the jury may well have believed, even if we convict a first degree murder, the judge would have discretion to give a lower sentence. And by giving the jury punishment information, what Shannon says is you invite the jury to speculate about that. The difficulty that I have, and I want your help on it, is you rely on, just as some of this is brought to light, Shannon and Parrish. But in those cases, the court was saying, we're not going to overturn a conviction based on the defendant's argument that there should have been something told to the jury about the available punishments. But here you're the opposite. You're asking us to extend Shannon and Parrish to encompass a situation where the district judge did the converse of that. Or why should we extend the court's supervisory power to apply in this very different scenario, particularly against the background of Fero, where we said it's not a violation of someone's fundamental right to due process to do exactly what the judge did. I'll tell you why. I'm going to quote directly from Shannon. Quote, juries are not to be informed of the consequences of their verdict. Then this court also said, in a case I cited in my brief, a district court has no discretion to inform jurors about the consequences of their verdict. So Shannon says, not only is it not required for the judge to give this information, it is not permitted. Now maybe it's dicta for the Supreme Court to say it's not permitted, but this court is bound by dicta of the Supreme Court almost as strongly as this court. Does it matter that these cases that you've cited are not death penalty cases? No, it doesn't matter because the rule is categorical and there's no limiting principle for the government's argument. Because Judge Kelly said, what if somebody's really concerned about the death penalty? A lot of people are really concerned about mandatory minimum sentences and don't think people should be given a mandatory minimum sentence of 30 years for crack cocaine. So what would you say if the juror had asked, is this a capital case? That's information about punishment. That's the same thing. So you say, I'm sorry, I can't tell you. It's a hijacking case. Not I can't tell you, but the juror is effectively saying, should I be worried about punishment? Is punishment my problem? And the judge is supposed to say, punishment is not your problem. And if the judge is permitted to do it in this case, you're going to have the next case when somebody says, I'm really worried about mandatory minimum sentences. And the government says, let's tell them this isn't a mandatory minimum sentence case. Or somebody doesn't think life without parole should be imposed on juveniles. And the government says, let's tell them the stat max isn't life without parole. You can have, and what Shannon said is if somebody's asking for an exception to this and there's no logical limiting principle, they don't get an exception. And that's exactly what we have here. Now I want to talk about the decision in Farrow that you brought up. We're not arguing that this is a requirement of due process. What we're saying is that the Supreme Court has announced a supervisory authority rule in Shannon. And this court has recognized it too, that you can never do this. They also recognize, Shannon, well, you know, if Congress told us that we're allowed to do this or that we have to do it, then that would be an exception. And that's another thing I'd say to you, Judge Kelly, is we have this categorical supervisory authority rule. If the jury should be given information about the death penalty, that's something for Congress to decide. If Congress wants to say. So if you've got a death penalty case, you're going to ordeer them and you're going to tell them it's a death penalty case, right? So what the Supreme Court. Correct? Yes. All right. So if they think it's a death penalty case and they say my values will not permit me to sit on that case, you would want them to sit on that case. The other side would not want them. And they'd be probably excused if they could not put that aside and decide the case on the facts. The Supreme Court has given us a very clear principle to deal with that from Shannon. And they said this rule applies in a case where the jury is not going to have a sentencing function. Where the jury is going to have a sentencing function, of course you can talk to them about the penalty because punishment is their concern. In a death penalty case, punishment is their concern. If it's not a death penalty case, it's not their concern and they should be instructed not to consider the punishment. The other thing I would say is that the government raised the issue that, well, later on in the case, they got an instruction not to consider the punishment. But that doesn't distinguish this court's decision in Greer that I discussed. The court's decision in Greer, they overheard some punishment information from the US Marshal. The district judge instructed them that punishment was not their concern. The court found that providing that information was a punishment. It was erroneous and prejudicial nonetheless. And the reason is because it sends the jury mixed messages. On the one hand, as Shannon says, when you give the jury punishment information, you're inviting them to consider punishment. And then you tell them not to consider it, it sends mixed message. And that confusion in and of itself is prejudicial. So it's a no-win situation? No, exactly. Or if you don't tell them? No, it's a very easy situation. The very easy situation is a juror asks about punishment. You tell them punishment is not your concern. That's not something you need to be thinking about. It's not a no-win situation. It's a very easy rule to apply. And the judge violated that rule in this case. And with the court's permission, I'll reserve the remainder of my time for rebuttal. May it please the court. Counsel. Joseph Spindle on behalf of the United States for the District of New Mexico. In September of 2017, Brian Toney was convicted by a jury of his peers of first degree murder and two counts of witness tampering. He's now asking this court to overturn those verdicts based upon two supposed errors, despite insurmountable evidence of his guilt. At trial, Mr. Toney virtually conceded all of the elements of his guilt. He took the stand on his own behalf and admitted that he had motive to kill the victim. Then in the middle of the night, he drove to the victim's house. He took the victim from the house to the middle of a remote area in the desert in the middle of the night, smashed the victim in the face with a rock and then stabbed him several times, including in the back. Hit him with a hammer too, didn't he? He did, but he didn't concede that on the stand. So his singular claim on the stand was that he was acting in self-defense. And this was almost laughable considering the evidence of his guilt and against the self-defense claim. Most importantly, to begin with, is the 911 call. There was a recorded 911 call that the victim made that lasted about 10 minutes in between the time when he was initially hit in the head with a hammer until his death. In that call, he identified Brian Toney as his assailant. He said Mr. Toney hit him in the head with a hammer and he was begging for help from law enforcement to come and assist him. The harrowing call ends with him saying, here he comes, here he comes, here he comes. The call goes dead and the victim's found dead the next day.  Well, get to the point on what the juror asked and if it's right or wrong. I'm sorry, regarding the voir dire question, Your Honor? Yes. Regarding the voir dire question, during voir dire, as a response to a question from a potential juror. I know that, but is that good, bad, or indifferent? What's your position? It was the absolute correct thing to do in this case. Yes, it was the correct thing to do. And here's why, Your Honor. By the potential juror asking the question whether or not death penalty was on the case, he was going to be considering the consequences of the verdict. That was the indication right there. The entire veneer heard that, so the entire veneer was, at the same time, going to be considering the death penalty in this situation. Because it was not a death penalty case, if the judge had answered the way that appellant counsel is requesting this court or instructing this court she should have responded, which would have been, do not consider the consequences of your verdict. That would be implying that this is a death penalty case, potentially. It would not have alleviated the concern of any of the jurors. And the parties wouldn't have been able to follow up specifically on the death penalty and parties' positions on the death penalty, the jurors' positions on the death penalty. And with such an inflammatory issue like the death penalty, especially in a state like New Mexico, where the state system has abolished the death penalty, you would have an entire veneer that would be unable to do their jobs. But how do you reconcile that with the scope of the language that Mr. Lee was talking about in quoting from Shannon? Well, Your Honor, in Shannon, the Supreme Court, Justice Thomas writing for the court, had an opportunity to absolutely draw a line in the sand and say the court should never instruct or inform the jury of penalties. And the court didn't do that. It is well established that when a jury has no sentencing function, it would be admonished to reach its verdict without regard to what sentence might be imposed. And then he goes on to elaborate on, as I read it, an all-encompassing unqualified prohibition against disclosing anything to the veneer about potential punishments. Well, later on, the court does say that although we conclude that it didn't require instruction in this matter, and I'm looking at page 587, Your Honor, he did say that it may be necessary to counter a misstatement. The appropriate response, of course, will vary as is necessary to remedy the specific misstatement or error. So if somebody opens the door, but that didn't happen here. It was opened by the misstatement of the juror, which was a misconception that they believed. Well, how can a question be a misstatement? Well, that was one of the main things, is by asking that question, they were indicating that they believed death penalty was potentially on the table. And the only way to rectify that is by simply and succinctly saying, death penalty is not on the table. And what the judge did there is she answered accurately, death penalty wasn't on the table. She didn't instruct the jury of anything. She didn't discuss the actual penalties of the case. And she didn't imply any leniency. So when the DeVere member says, is the death penalty on the table, and so that is an affirmative misstatement that the death penalty is on the table? And that is going to trigger the limited exception in Shannon? Yes. By asking that question, they're implying that they believe the death penalty is on the table, and that they are considering it as a possible verdict. And because of that, the court would have to remedy that. The only other alternative, as requested by a defense counsel, would have been to say that there were no, not to consider the consequences. But because under the Witherspoon-Witt standard, in death penalty cases, the parties would be able to inquire into the positions. In this case, we would be disruptive of the proceedings because we wouldn't be able to ask whether or not jurors could be fair and impartial. What the court was doing wasn't instructing the jury on a possible penalty. It was alleviating that specific juror and any other juror's concerns about whether or not they could serve fairly and impartially on this jury panel. They were inherently thinking, if death penalty is on the table on this, I don't know if I can be fair and impartial. We couldn't inquire into that because it wasn't a death penalty case. And so the court alleviated that juror's concern and the rest of the panels by saying, that's not something that will render you of being a biased juror in this situation. You can still be fair and impartial, and you don't need to concern yourself with that specific issue. And to go a little further. But doesn't that pronouncement by the court lessen, in essence, the burden of the government? It's an easier case for you to prove a case and to establish a verdict beyond a reasonable doubt if you're not looking at the death penalty. No, I don't think it would, Your Honor. It's still a first degree. You don't think jurors really agonize over the decision of a death penalty verdict? Oh, I certainly agree that they would. And I think that would be the issue, is that under the Witherspoon Witt standard, if it was a death penalty case, we would have to have a death penalty eligible jury before being able to even try the case. In this case, as a first degree murder, I don't think any of the jurors were taking the responsibilities lightly. This was a first degree murder. And in fact, I think the fact that they deliberated for several days shows that they were taking their responsibilities very seriously. And I also think there's an invariable assumption that jurors follow the instructions the court gives them. And in this case, at the conclusion of the testimony and evidence, the court instructed them on the specific burden. And the court instructed them with the 1.20 pattern instruction not to consider the consequences of their verdicts. On the other issue that's raised by the defense, was it improper for the district court to exclude the methamphetamine evidence? No, it was not improper. At the time of the motions in limine, the United States moved to keep the evidence of the methamphetamine out. The evidence that was available was that at the time of the autopsy, the victim's blood was drawn. And inside of his blood, he had some level of methamphetamine. And in his pocket when he was found, he had some suspected methamphetamine. And didn't the defense say they wanted to use that because they were going to somehow develop the point under self-defense that if one uses methamphetamine, you become aggressive, paranoid, violent? Yes, that was what defense's position was. But under 404B, which I believe at this point appellate is even conceding, we're arguing only 404B, not intrinsic evidence. Under 404B, a party is required to precisely articulate why that evidence is relevant and how they're going to admit it. Well, wasn't that done? It was not, Your Honor. The relevant part? The relevant part was partially conducted. How they're going to admit it was the very difficult situation. And the reason I say the relevant part was partially accomplished is that we're not claiming here that the influence of methamphetamine or illegal narcotics is always irrelevant. Certainly there are cases where the United States produces evidence of that and it can be relevant. What we're establishing, what our argument is here today, is that in this specific instance, Mr. Tony was unable to explain how the fact that the victim's blood composition may or may not have had a level of methamphetamine that may or may not have affected his behavior was relevant. Well, but the court cut off that whole line of inquiry, did it not? Well, the Mr. Tony had not. I mean, you can't just at the beginning of it, when the defense is saying, we want to get into this methamphetamine evidence, is it fair then for the government or the court to conclude, well, you haven't said anything about an expert. Whoa, wait a minute. We're not that far, are we? Well, doesn't the defense have the opportunity to support self-defense? Yes, certainly the defense has that opportunity, Your Honor. And certainly had they produced evidence which could have established all those things that the court just addressed, it could have been an error. But in this situation, when given the opportunity, the proponent of the 404B evidence did not indicate exactly how they're going to establish that the victim's, the methamphetamine in the victim's blood would have been to a level that it would have put him under the influence of the methamphetamine? Yeah, but here we're at a motion in limine before trial, right? Correct. And wouldn't a better approach have been, it sounds to me, defense counsel, that you've made a valid point that this could be helpful in your self-defense argument, and we'll let this proceed in trial and see how it develops. And then if it's just someone saying, without expertise, this is what happens when you're taking meth, then you've got a problem as far as the defense is concerned, because you don't have adequate evidence to support your claim. No, because the possibility of proving that the victim had some degree of methamphetamine in his system without being to establish the relevance of that methamphetamine in his system would only serve to bias the jury against the victim in this situation. Well, that's a 403 issue, not a 404B issue. Correct, correct. And the district judge didn't exclude the evidence under Rule 403. So I don't know how your answer helps you elucidate the problem that Judge Briscoe is posing. Well, did they admit they were not going to bring an expert on? They did. Was that at the motion in limine? Yes, on the record in the motion in limine. The proponent of the 404B evidence indicated they did not have an expert. This was a month after the response, approximately, which they indicated that they wanted to introduce the evidence of methamphetamine. What if the proffer had been not that he was taking methamphetamine, but that he had been drinking whiskey? I think there's a big difference there, Your Honor, and that's because drinking whiskey is widely understood by lay people. The average juror would understand the effects that alcohol would have on somebody. To the inverse of that, as noted in our response brief, one out of 250 people have used meth in the last month. That's a very small proportion. OK, I've never, just for the record, I've never used methamphetamine in my life. But I have no doubt that it, yes, but... I have noted that. Thank you. But why does the fact that I've never taken methamphetamine cast any question on the fact that I, and probably everybody in this room, knows that methamphetamine is widely and commonly known to cause irrational, aggressive, violent behavior? Because without providing some form of evidence, and the way that they attempted, according to their response brief to the motion of limine, to establish this was through judicial notice. They didn't have an expert, they didn't have an eyewitness to testify about this. They said that they were going to ask the court to take judicial notice of the fact that meth makes people violent. That's only for something that's generally known in the community at large. So you don't, so you need an expert to testify about that, because there are a lot more, a lot fewer methamphetamine addicts than whiskey addicts. And so that's why you don't need an expert to testify about the aggressive tendencies of drinking whiskey. Is that the distinction? Yes, the distinction would be the common usage of alcohol means that it's generally known what the effects of it are in the community at large. A potential juror would know that. Methamphetamine is distinct. And in this situation, even if the common person in the community would understand that methamphetamine was something that causes people to be violent, we didn't even have evidence that was proffered by a defendant at the lower level that he was under the influence. In fact, one of the- Well, the nephew would have testified that. I mean, we know that the nephew, the roommate, would have said that the guy's on methamphetamine. It's possible. That's not why the evidence was excluded, was it? It wasn't proffered that he would have testified that. Certainly, it could have been possible, and I don't want to put my, I don't want to establish that necessarily right here. But what I'm pointing out is that in their opening brief, appellant points out that in one of the articles that he cited, that methamphetamine has an outside impact, influence on somebody of 12 hours. He didn't have anybody that could even establish that the composite of his blood at the time of the autopsy, the victims, that that was within the 12-hour window of when meth would have affected him. Certainly, things can remain in people's bloodstreams long after the effects have worn off. He didn't have any evidence that the victim was under the influence at the time, and he didn't have any proffered evidence of what, under the influence, would have manifested itself as. I thought they had a blood test and a definite knowledge of what was in the victim's system. There was a blood test that indicated he did have some level of methamphetamine, but the import of that level of methamphetamine was unestablished. They didn't explain that this level of meth means this much. There's not a person... And there was no report that said the level? It just said some? No, it had a level, but a common juror wouldn't understand what that level means. Well, but then, as I said before, I think that, is this the time to shut down this evidence? Or do you say, well, let's see how this rolls out, Defense Counsel? If you've got something behind this assertion, we'll see what you put on at trial. And if they try to come in with, I don't know, learned texts or articles, then I suppose you bring an expert to say this is all hooey. But isn't that when you do it, is at trial, rather than preliminarily? Because of the cause of concern of what that evidence could establish, if there was no relevancy of it in the first place, I think the court gave Mr. Toney ample opportunity to establish the relevance under 404B, which he failed to do. He had the burden of establishing the relevance of it, and he didn't do that. All he said was he wanted to be able to establish that he was under the influence of methamphetamine. And why? He said why, because it causes the person to be aggressive and violent. And without being able to establish specifically what level it was and if he was under the influence of it. Thank you. Thank you. Judge, can I ask one question? Sure, go ahead. I just want to ask you, does it matter that this is reverse 404B evidence? Typically, 404B comes into play because the government is wanting to present evidence of the defendant's other bad acts. Here, it's the exact opposite, what we call reverse rule 404B, which typically gives rise to a more forgiving standard. Does that make a difference? Slightly more forgiving, Your Honor, but there's still the same concerns. And that's just the interest of fairness at trial. This would have been a situation where the victim, who was already being dirtied up, for lack of a better term, by defense during the trial, would have been dirtied up further. This would have been almost asking the jury to nullify based upon the methamphetamine usage versus any valid relevant purpose. Thank you. Thank you. Thank you. I'd like to make two points about issue one and two points about issue two if I have time. First, on the punishment information. It is not true that the judge had to provide this information to ensure that the jury would be fair and impartial. What the judge can do is what it always does when the juror expresses a concern. Can you follow my instruction not to consider punishment? Or are you going to be so worried about punishment that you won't be able to side this case on the facts? That entirely cures the government's concern about the juror not being able to set aside the concerns without violating Shannon. So that's how you do that. The second is there's, again, no limiting principle for this idea that if the juror asks a question about the death penalty that you can provide the information. What if the next question is, well, if we convict him of second degree murder, is he ever going to get out? Does the judge have to say, well, he might get out? Or if we convict him of first degree murder, is he going to get out? Or we can wait for that case. Well, I think you have to set the rule here, right? Not necessarily. What Shannon says is when you're deciding whether it's permissible to do this, you consider whether the party who's wanting to provide the information has a limiting principle. And there isn't one. So now turning to the second issue about the methamphetamine. The district court didn't exclude this evidence because it said Mr. Tony failed to establish that it was relevant. What the district court said is, you have not proffered a proper purpose. You have not given me a non-character purpose. That's just wrong, and the government virtually concedes that it's wrong. So then we go to, can we affirm the district court on alternate grounds that it didn't breach? And what this court has said is, the record has to be sufficient for the court to indisputably determine that it would be right to exclude it on these other grounds. The record's not sufficient for the reasons that Judge Briscoe was asking about, that, well, do we have to know whether he was high on methamphetamine that night? Well, if the judge hadn't preemptively excluded this information, we might have elicited testimony from Joey Mann or any of the other people who were around him that night who could have corroborated that he appeared to be intoxicated, that he had taken it a couple of hours before. When and how exactly was the proper purpose proffered? It was done twice. First, in response to the government's motion in Limine, where the defense said, we're going to prove that he was high on meth at the time of the incident. That's important, given the effects of meth on human behavior. And given the effects of meth on human behavior, it's going to show that he was the first aggressor. Did you admit that there was no expert coming? He did say there was no expert coming. That doesn't have anything to do with it. How does a juror know what the effect of meth is? I don't know what it is. Well, so I think it is within the common understanding that being on meth can cause you to behave aggressively or irrationally. And the case, Ricciardi, that I cited in my brief, says, quote, jurors are not to be presumed ignorant of what everybody else knows and may act upon matters  on those matters. And that's what we have to do. So you're saying everybody knows the effects of meth? Well, actually, what I'm saying is that it would not be an abuse of discretion for a district court to determine that it's sufficiently within common knowledge to be relevant. Don't you have to prove the precise opposite of that? Because the judge said the defendant has not provided the court with a permissible purpose for the introduction of specific evidence of prior bad acts. So do you not have to show that it was an abuse of discretion for the judge to make that very finding? So there's a distinction here. Did we proffer a non-character purpose? We definitely did that. So the district court's decision is wrong. Now the government is saying, well, we can affirm it on this alternate ground that you didn't prove that meth can cause violent behavior. And so then you ask, that's a discretionary judgment by the district court. If we're affirming on alternate grounds, you ask, would it be an abuse of discretion not to rule in the government's favor on that alternative ground? And those are the cases I've cited in my brief. And you can't say it would be an abuse of discretion for a district court to think that this was a matter of common knowledge. And so I'd ask that you reverse on either or both of those grounds. Thank you both for your arguments this morning. The case is submitted.